20-3005, Page v. Commandant. Mr. Meyer. Good morning, Your Honor. I'm sorry. Did I pronounce your name correctly? Meyer or Mayer? It's Meyer, Your Honor. You may proceed. Thank you, Your Honor. Good morning. May it please the Court, Sean Meyer on behalf of the appellant, Jeffrey Page. Good morning to counsel for the United States. And I'd like to make three points during this morning's presentation in the context by first setting the factual background that this is a tragic case where two young American soldiers were deployed to Jordan and without getting too much factual detail, one soldier, the appellant, shot his buddy and killed him. The issue at trial solely was the mindset at the time the fatal round went off. And I'd like to begin with the first point being the lower court failed to apply this court's holdings in Monk and which state that when there are substantial questions of constitutional law that are largely free from factual issues. It is appropriate for an article 3 jurist, an article 1 district judge sitting in the 10th Circuit to reach the merits of that constitutional claim and adjudicate it. The lower court's decision... I don't know of anyone who has a steeper hill to climb to get relief than someone representing a person convicted through a court-martial is appealed through the military justice system. We're working on that. All we have to look at is whether the issue is considered and it sure looks like it was considered. I respectfully disagree, Your Honor. And here's why. The lower court, the district judge sitting in Kansas, he failed to apply the lower court's holdings in Monk and Dotson. You're saying the district court? Yes, Judge. Yeah. We don't really care. This is de novo. Right. Yes, Your Honor. What had to be considered, where it had to be considered was in the military justice system. Right. So if we return to the... And how was it not considered in the military justice system? The standard to be applied for the article 1 tribunal was whether or not prevailing Supreme Court standards were applied and whether or not those considerations raised on direct appeal in the article 1 system were fully and fairly adjudicated. And our position based on the record is counsel had 12 witnesses available to him on the single issue of whether or not Specialist Page intended to kill his buddy rather than whether or not this was a mindset of culpable negligence. And defense counsel under Strickland v. Washington never called any of them to include two police officers and two police reports which were exonerating in terms of actual guilt because Page pled guilty to manslaughter. He knew it was a terrible mistake and he regrets it to this day. But at the same time the government went forward and tried to prove up murder and premeditated murder and did. But the challenge though was the testimony of those 12 months with Page never made it to the inside of the courtroom judge. So on a direct appeal Page raised that very constitutional issue to say reasonable counsel would have called those witnesses, especially when counsel was at the pre-trial hearing and heard the verbatim transcript where they said in the five months in the Jordanian Desert, we saw nothing to indicate that Page wanted to kill anybody. As a matter of fact, we think it was a terrible accident. But yet. You seem to be proceeding on the assumption that prong four of Dotson whether fully and fairly considered means that we review it for whether it was decided correctly and I see these as two different issues. One is did the military tribunal fully and fairly considered the issue not when it decided it did it make a wrong decision? Well, yes, your honor. I agree with that assessment. There are two different questions to be answered there. But one of the main points that I'd like to share with the court as we make I hope clear in our papers is the article one tribunal on appeal ignored an entire body of manslaughter case law and to ignore prevailing precedents on point cannot constitute full or fair consideration. How do you know it ignored? Were these cases that were submitted to the tribunal? Yes, your honor. They were written. They were cited. They replied. Yeah, and there are mentioned nowhere in the opinion. Well, I can tell you just because we don't cite something in an opinion doesn't mean we didn't read it and consider it. You know, there's no requirement that an article one tribunal list every case it considered in reaching its opinion. Is there? Can you point us to something? No, your honor. And that's not the position that we're presenting. Instead, if we take a step back, we have 12 witnesses, two police officers, two police reports, and an entire body of law that was ignored all sitting in front of us wrapped in a transparent bag and the article three courts of the United States are reluctant to touch it because they think that the military one tribunal had the expertise to get that right. Well, let's look at the merits a little bit. You know, one of your arguments has to do with that. They didn't look at the contents of Mr. Page's computer and the court said, you know, the fact that he doesn't have anything on his computer saying I want to kill another person doesn't in any way advance the ball. It's irrelevant because it doesn't tell us what was in his head. You might wisely not put it on your computer. I mean, that's a rational decision, isn't it? It is, but it's only half of the decision because Okay, let's keep going. Your police officers, the investigatory officers made a very preliminary assessment that through further investigation a different conclusion was reached to charge him with a higher crime. The court said they didn't really have much to offer because they were very early and they hadn't done much. Again, that's rational. Your Honor, that's with regard to the Air Force Office of Special Investigation Report, but the Army CID agents, two of whom fully investigated the cases, did a forensic analysis, interviewed, canvas blanket interviews of the entire number of personnel who were there that day, testified under oath that in their experience they saw nothing in Page's mindset that he wanted to AP the victim in this case terribly to be killed, to be murdered, that it was a tragic accident. So to take a step back here, how can we as Article 3 American jurists, when we look at 12 witnesses, two reports, counsel's fully unaware of them, our client is sitting on trial for life and admits that it was a tragic accident and you don't even try to put these people on and then the post hoc justification on appeal is I didn't think any of that evidence was admissible and that's a misapplication of the rules of law. So all of these things come together to say, how can this evaluate, how can this trial in Article 1 appeal be fully or fairly considered? And I'd like to refer the court to Burns, the plurality decision in 1953, which states the plurality agreed that if the process is inadequate to resolve the substantial constitutional claims, the Article 3 courts, as the ultimate arbiters of what the law and the Constitution is, should evaluate the merits and make the decision. The deference to the military courts is not appropriate. And here's another example. Your Honor, if one of your clerks, for example, this morning didn't come to work and didn't come to work for a second day, Your Honor, you may counsel that person or you may fire that person. But, you know, in the Army or in the Marine Corps or the Navy or what have you, if they don't show up, that's an offense. That's the offense where deference by Article 3 jurists to Article 1 military justice officials should come into play and still survives. But when you have the Sixth Amendment in Strickland v. Washington, plus the ignoring of an entire swath of case law, all of that coming together presents the fact that this young man did not get a fair trial. And by virtue of that, that's why we appeal. So yes, admittedly, the scope of review is very narrow, but we believe that looking through Burns, Monk, and Dotson, the question before the court is substantial, largely free of any factual issue and one entirely appropriate for the district judge to have adjudicated. And there was no reason to pass it along. Even though the court wrote, there are those circumstances which this circuit, and in this circuit, it's still good law, where even though the court has written, the court's going to say, you know what? A defective in jurisdiction goes to the cornerstone of due process. We're going to write on it. You know what? Another defective in jurisdiction, even in two... Let me get back to these specifics here. Yes, Your Honor. Essentially, you're saying that the military tribunal did not properly review a claim of ineffective assistance of counsel. Am I correct? That is a piece of it. Yes, Your Honor. And the ineffectiveness that we're talking about is the failure to call 12 witnesses who would say the defendant never expressed any desire to kill the victim. In the five months... Anything more than that? Yes. In the five months with which I had served with him in the desert for 12-hour shifts, I saw no animosity. I saw nothing between the two of them that would ever give me reason to believe. I knew both of them. And in the time that we served together in that, we call it dog years when we're overseas, I saw nothing that we didn't conclude. And as prudent defense counsel, defense counsel was at the pretrial hearing and heard this verbatim testimony, the transcript of which is before the court right now. And you can read the testimony. We don't know how reasonable counsel under Prong 1 of Strickland v. Washington can say, I'm not even going to try to put that on. That is... It's a difference between life and 10 years. It's a difference between premeditated murder and manslaughter. You said that's one part of it. What's the other part of it? In terms of... Oh, the other part of it, Your Honor, is the court was briefed. The Article 1 Military Tribunal was briefed on a body of case law where manslaughter, where soldiers were pointing rifles at each other, pointing pistols at each other, throwing a hand grenade into a shower tent, all of which constituted culpable negligence, not specific intent to murder. And the lower court and the Military Tribunal completely did not consider any of it. And that's problematic because Burns counsels that if the process is legally inadequate, one of which being defining legally inadequate as failing to apply prevailing standards. That's where this case is very problematic. And admittedly, the standard of review is narrow. But this is the kind of case where the Article 3 jurists, the district court, has the authority, if not, I dare say, with respect, the obligation or duty to say, you know what? The Constitution wasn't observed here. And a young American soldier who was on the National Honor Society, who was 22 years old, who had never fired his rifle before, who was looking through a broken optic, who was monotonous in the desert, and as soon as he fired his rifle, ran out to help his buddy, said, oh my God, I admitted it, tried to plead guilty three times to manslaughter. The prosecution would have none of it. But then when he did, he finally pled guilty to manslaughter the fourth time naked. In other words, without the benefit of a deal. Then, the prosecution went forward with 11 witnesses, not one of whom can provide any evidence of intent to kill. At the same time, defense counsel had before him a very robust case. And those of us who have been prosecutors and our defense counsel, you would have to call those witnesses and develop them. And so, under Strickland, ordinarily, we would provide tactical deference, right? But the post-trial affidavit defense counsel submitted was, this was all inadmissible. I would have drawn objections. And that's why we spent some time in our papers before the court saying, rule 601, 602, 701, 702 says that laypersons can describe what they saw, providing the trier of fact with inferential information to say, you know what? Even though that round went off, there was no direct evidence of specific intent to kill, especially when the Article 1 tribunal and the Article 3 court below ignored the definition of the statute. The very statute itself before the court gives an example of what manslaughter is. And that's when two soldiers point their pistols at one another, believing them to be safe in the unready-to-fire position, but they're ready to fire and one soldier's killed. That's what the example is in the manual for a court-martial. That standard, too, was not applied. So, you put all of this together and you say, how many standards have to go unapplied before an Article 3 jurist, the expertise of a jurist, in other words, and not to besmirch my brothers and sisters on active duty, I'm a lieutenant colonel myself in the Reserve, having prosecuted and defended, that they're military officers first, managing careers. They're not dedicated jurists. So, the idea being you can't ignore all of those witnesses who would have come in and if I were on trial, my God, I would be so saddened that I'm doing 26 years in the penitentiary when the case law says I should be doing two to three. Thank you. I think we understand your argument. Yes, Your Honor. Much obliged, Your Honor. Thank you. Mr. Mag. Good morning, Your Honors, and may it please the Court, Jared Mag, on behalf of the respondent, the Commandant of the United States Disciplinary Barracks. Your Honors, I think this Court can appreciate that these types of cases are very fact-dependent and that Mr. Marr's plea for this Court to accept the idea that a body of case law exists that supports his position somewhat misses the point. Certainly, there are cases throughout the military appellate system which demonstrates that certain events and certain acts on behalf of soldiers supports the idea that manslaughter is the more appropriate charge, but those are very, very fact-dependent. Each case is really burdened with its own problems and its own facts. There's not one uniform set of facts that applies in a manslaughter situation. Why don't you interrupt for a minute? I kept thinking someone might tell me what evidence came in as to the motive and intent here, and I really didn't see anything. So, Judge McHugh, the evidence that the Army presented during the court-martial proceedings involved the rebutting or dismantling petitioner's argument that he had chambered around the day before and had mistakenly assumed that he had cleared his weapon. Through that, they were able to rebut petitioner's arguments that he had, in fact, chambered around during an event which is described as the sand truck event, where he had gone, along with two other service members, to approach a sand truck that was approaching the entry control point and that he had chambered around. The government had put on evidence to rebut that, showing that that sand truck incident did not happen the day before. In fact, an event that other soldiers were aware of, which was a significant event involving the Jordanian forces and the American forces were occurring the day before, and that no trucks had come to the entry control point because of that event involving the Jordanian military force and the Americans. And so, for all intents and purposes, they had demonstrated that the base was somewhat shut down. So the petitioner's argument that he had, in fact, chambered around during that event was, in fact, disproven by the facts that that sand truck incident didn't occur. Secondly, they relied heavily on the fact that the petitioner would have had to have, on four separate occasions, decided to forego his training and not clear his weapon. And they described all four instances where he would have had to have, as the process is, when an infantryman clears their weapon, there were four points in time where he would have had to have actively decided not to follow his training and, therefore, decide to simply hand his weapon in, not clear the weapon via protocols, and allow that round to continue to be chambered in his weapon. Third, they were able to put on what the military qualified as an expert, someone who would have to demonstrate that the shot taken by a petitioner was a very thought-out, deliberate act on his part because of the distance. And had to go through the process of chambering the round, thinking through the process, narrowing the focus of the shot, and actually hitting the victim, in this case, in the head from several meters away. And at the end of the day, that evidence was presented. Now, here's what's important, I think, to circle back to what Judge Hartz had said, is that while the Army Court of Criminal Appeals did not look or did not give a written opinion on this, which they're not required to do, and this court has well-established precedent which says that this court does not take into account the fact that they did not take into consideration or did not write an opinion about this issue,  petitioner's argument because if you look at footnote three of the opinion from the Army Court of Criminal Appeals, it's important to note they granted appellant's motion to attach their verbatim transcript of the Article 32 hearing, which means they looked at and considered exactly what he wanted to be placed in, because the Article 32 court heard the evidence of the service members who Mr. Mayer talks about testifying to the lack of any motive on the part or any answer to the question. Any animosity on the part of Specialist Page and the victim. Now, at the same time, this court has to appreciate Article 66 of the Uniform Code of Military Justice, and that is important here because it obligates the Army Court of Criminal Appeals to review the record in full, in a de novo, if not a hyper de novo review of the record to determine and satisfy for itself that the defendant was in fact guilty beyond a reasonable doubt of the crime for which he was ultimately convicted. At the same time, I think it's important to remember that his case was tried to the court, it was not tried to a panel, and the judge that was taking into consideration this evidence, when looking at the record, did an extraordinary job of identifying the rulings at which he was deciding as to whether or not to admit certain evidence. He was giving basis for those rulings and establishing a significant record. And at the end of the day, this court has made it very, very clear in a number of opinions that it does not sit to reassess the facts of a case that were fully and fairly considered. Did the military tribunals consider or comment on the position of defense counsel that he didn't think this other evidence was admissible? So, yes. And whether that was effective representation or not? If the court reads, in the Army Court of Criminal Appeals opinion, they cite to the Strickland Standard and reference the fact that that evidence would not have been admissible as opinion evidence about what other members thought or what they saw because it was opinion testimony. The court was clear that, in its opinion, that the case revolved around the moment in time when Specialist Page decided to pull the trigger in this case. So, the military tribunal ruled that, in fact, this testimony of non-hostility that would have been provided by 12 people in the unit would not have been admissible? They said that? It stated, it is, and I'm reading from the opinion, Judge Hartz, it is impermissible for a lay witness to testify as to their personal opinion as to whether appellant possessed a specific motive or intent to kill. And they ultimately made that determination that that would have been inadmissible now. Well, but that's not, I mean, yeah, they can't get on there and say, I have, I opine he didn't have the motive to kill. But what they can relate properly is that I spent, you know, 72 straight hours with him and and I saw him interact with the victim and never did I observe any animosity or aggression. Right? I think that's a fair statement, right? That's a fair statement, Judge McHugh, but at the same time, I think the court has to appreciate where the defendant's counsel, or where petitioner's counsel were at the time. And two issues that they really were, I think, referenced was the idea that if they put those individuals on the stand, it opened up the idea that there was quite a bit of animosity toward this victim. And for Mr. Mayer to, and I have great respect for Mr. Mayer, so don't take this in the wrong way. These were not buddies. Okay, well, in the material, the record, there is a suggestion that presenting these witnesses would have backfired, but because there was some some negative evidence that it would have opened up, but sure isn't much to tell us what we're talking about. It's all sort of vague and obscure of what we're talking, what it is. So it is hard to assess. Again, Judge, I think this is what highlights the point. It may be obscure for you. It was not for the Army Court of Criminal Appeals. They had the record from the Article 32 hearing before it, and that is critical for this court's analysis to determine whether or not there was full and fair consideration because at the end of the day, That transcript of the record is important for our analysis? Is that what you're saying? It was important for the Army Court of Criminal Appeals. It's important for your ultimate analysis, Judge Hart, as to whether or not full and fair consideration was given by the Army Court of Criminal Appeals. Is that part of our record on appeal? I do not believe that Mr., that, no, I believe that it is. Mr., Mr. Maher did put the Article 32 transcript. I believe that's the largest part of the appendix in this case. Now, there was hostility apparently after the victim was promoted. Do we know how long before the shooting that promotion was? I don't have any evidence at hand to know that he was promote, how far in advance he was promoted. We simply know that there was a bit of animosity based upon some of the statements or some of the things that the victim was saying to other service members that were crude or otherwise inappropriate as well as the, as well as his advancement, which appeared or it would seem that his advancement was not well received by other members in the unit. And then that is coupled with the statement that, that petitioner makes after the shooting when it is, it is presented that he was, he laughed and said that the other members of the unit would find it funny that he killed the victim because everyone hated him so much. And that statement was of course placed in front of the, of the court at the time as well, which further established some sense that maybe there was a motive in this case and the government highlighted that, that statement that Specialist Page had made just shortly after the shooting and to indicate that it is, that that statement led at least toward the idea that there was something more that was going on here. Does the article 32 transcript include anything about this, the concept of dry firing being authorized and encouraged? I don't know, Judge Murphy, I don't know that there's a dispute that they encouraged service members to engage in dry firing at inanimate objects. That was a common, common training, but certainly they, they at every turn to ever dry fire at another service member. It was trained to shoot, or trained to aim at inanimate objects only. But is that in the article 32 transcript? I believe that there is some discussion, well, I suspect that you'll find there's quite a bit of discussion about what is called glassing or dry firing, but glassing, of course, is aiming at another service member to try to, when they dry fire instead of pointing at an inanimate object, they would in fact point their weapons at other service members. The extent of that I think was certainly in, it could have been in dispute at the time as to whether or not that was going on on a regular basis. But at the end of the day, the Army Court of Criminal Appeals appreciated the fact that it came down to the point in time as to whether or not the petitioner had the intent to shoot and stacked against the evidence which, which rejected and refuted at length his argument that he had chambered around. The court ultimately concluded that the trial judge was correct in convicting him of the more serious charge. But in the very short time that I have left, I cannot understate that this court's standard of review is so incredibly restrictive in this sense. And it is important to remember that, again, that this court really does not sit to reassess facts that were fully and fairly considered. And these facts were briefed at length by both parties. And I think you can see that from the Army Court of Criminal Appeals opinion, when they realized the narrow set of circumstances that they had to look at to determine or satisfy for itself as to whether or not the petitioner was actually culpable of that offense. And that standard should apply under these circumstances. And unless the court has questions. Thank you. Your time has expired. Any questions from members of the panel? Thank you, gentlemen. Case is submitted and counsel are excused.